IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JOMAPS, LLC | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE NO: |
| | : | 1:12-cv-01376-TWT |
| v. | : | |
| | : | |
| D-MAND BETTER PRODUCTS, LLC | : | |
| and DENNIS MAKOWSKI, | : | |
| | : | |
| Defendants and Third-Party | : | |
| Plaintiffs. | : | |
| v. | : | |
| | : | |
| WAYNE F. ORR, in his individual | : | |
| capacity, and BALLISTIC BLOCKS, | : | |
| LLC, | : | |
| | : | |
| Third-Party Defendants. | : | |
| ----------------------------------------------------: | | |

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This matter comes before the Court on Plaintiff Jomaps, LLC's Motion for a

Preliminary Injunction. The Court conducted a full hearing on the matter on July 2,

2012 including written briefs and considering argument from counsel for both

parties. Based on the record before the Court the motion is denied based on the reasons set forth below.

## FINDINGS OF FACTS

This case involves claims of trademark infringement, UDTPA, conversion, expenses of litigation, attorneys' fees and punitive damages brought by Plaintiff Jomaps, LLC ("**Jomaps**") against Defendants D-Mand Better Products, LLC ("**D-Mand**") and Dennis Makowski ("**Makowski**"), the owner of D-Mand. A third party complaint has been filed against Wayne Orr ("**Orr**"), the owner of Jomaps, as well as third party defendant Ballistic Blocks, LLC. Compl. Plaintiff filed a Motion for Preliminary Injunction (the "**Motion**") on June 8, 2012 and this court heard argument on July 2, 2012. Mot.; Min. Entry.

The trademark at issue is for the M-1 Mark serial number 73076487 (the "**M-1 Mark**") which was originally registered in 1976 by Jomaps, Inc., an unrelated predecessor to Jomaps, LLC. Compl. ¶13. Until 2006, Jomaps, Inc was owned and operated by the Connell family. Compl. ¶14. In 2006 the Connell family sold the assets of Jomaps, Inc. along with the M-1 Mark to Orr Enterprises, LLC which then changed its name to Jomaps, LLC. Declaration of Dennis

Makowski ("**DM Decl.**"), ¶¶6-8. Makowski had worked for another one of Orr's companies since 2001 and once Jomaps purchased the assets of Jomaps, Inc. he moved into a position running Jomaps and the M-1 branded products. DM Decl., ¶9. The M-1 Mark is used to sell a branded family of mildewcide products added to paint and used in other products.

By 2010, Orr, the owner of Jomaps, ran into financial trouble and the Connell family threatened legal action against Jomaps for default on the payments which, D-Mand contends, could have resulted in the M-1 Mark and brand being transferred back to the Connell family interests. Supplemental Declaration of Dennis Makowski ("**Supp. DM Decl.**"), ¶¶4-6. D-Mand contends that in July 2010 a telephone conference was held between Orr, Makowski, and counsel for Orr in which it was decided to transfer all of the assets of Jomaps, including the trademark and all other intangible assets of the company, to a company that had been set up in 2009 by Makowski, D-Mand. DM Decl., ¶¶18-19. In consideration for this D-Mand assumed and paid all of the payables of Jomaps at the time. Id., ¶20. Other consideration included the assumption of contractual liabilities and payment of the rent on the space where D-Mand, Orr and Ballistic Blocks does

business, as well as allowing D-Mand personnel to do work for Orr and Ballistic Blocks. Declaration of Susan Massing ("**SM Decl.**"), ¶16.

Orr agrees that a decision was made to transfer receivable and payables to D-Mand, but states that the transfer of the trademark was "carved out" of the transfer of the other assets. Orr Aff., ¶¶3-8. Instead, Jomaps contends that only temporary permission was given to use the M-1 Mark to D-Mand that was revocable at any time. Id., ¶3.

D-Mand has submitted extensive evidence that all of the assets of Jomaps were transferred to D-Mand. Ex. 1 to Supp. DM Decl; Ex. 1 to SM Decl. The record reflects, starting at the end of July 2010, a flurry of activity to move assets from Jomaps to D-Mand. SM Decl., ¶¶4-15; DM Decl., ¶23; Supp. DM Decl., ¶21. On July 30, 2010 a letter went out to all of the customers of Jomaps to change their contact information and to send checks D-Mand at a new address. Ex. 8 to DM Decl; Ex. 4 to SM Decl. An August 3, 2010 email to customers states that Jomaps is changing its name to D-Mand. Id. Entries from QuickBooks show Jomaps transferring cash and assets to D-Mand in late August 2010. Exs. 1-3 to SM Decl.; Ex. 1 to Supp. DM Decl. The employees of Jomaps left and went to D-Mand and filled out W-4s for D-Mand, and W-2s were sent to the IRS that year showing the

employees were working initially for Jomaps and then for D-Mand at the end of 2010. Ex. 5 to SM Decl. In late 2010 entries on the books of Jomaps ceased and began for D-Mand. SM Decl., ¶9. All insurance policies were changed to reflect D-Mand as the new insured including the company's Commercial General Liability Policy. DM Decl. ¶ 42; Ex. 10 to DM Decl. Also, entries on the books of Jomaps and D-Mand by Susan Massing, who had worked for Orr for 25 years and left to join D-Mand when this dispute arose, shows that accounts payable in the amount of approximately $140,000 were transferred from Jomaps to D-Mand and that D-Mand assumed contracts that previously were the responsibility of D-Mand. Ex. 1 to SM Decl.; SM Decl., ¶10. Makowski avers that Orr was not involved in the day-to-day operations of Jomaps or of D-Mand after the transfer of the Jomaps assets. DM Decl., ¶¶12, 24, 40. In fact both Makowski and Susan Massing declare that Orr continued to work in the very same office in which the allegedly infringing activities were taking place for almost two years and that Orr had access to all of the books, records, documents, computers and activity of D-Mand at any time. DM Decl., ¶¶24, 40; SM Decl., ¶17.

On September 1, 2010 a lawsuit began between Jomaps and the Connell family over the alleged violation of a non-competition provision and the default on

the Jomaps' payments for the purchase of the business. Supp. DM Decl., ¶18. That same day, Wayne Orr himself signed an application on behalf of D-Mand with LSQ Funding, L.C. ("**LSQ**"), listing himself as a consultant for D-Mand, for D-Mand to receive financing for its new venture. Ex. 6 to DM Decl. After application for financing was submitted to and approved by LSQ, on September 14, 2010, LSQ filed a blanket UCC-1 financing statement showing a lien on all the assets of D-Mand, including but not limited to the intangible property of D-Mand, which expressly included any trademarks. Ex. 7 to DM Decl.; DM Decl., ¶34.

On September 17, 2010, Makowski in a declaration contends that he, Orr and counsel for Jomaps met with counsel for the Connell family to discuss a resolution of the pending lawsuit. Ex. 2 to Supp. DM Decl.; Supp. DM Decl., ¶18. According to Makowski, at that meeting Orr's side represented to counsel for the Connells' that Jomaps was defunct and that its business had been conveyed to Makowski's company D-Mand. Id. In support of the declaration the Defendants submitted a brief from that litigation in which counsel for the Connells avers identical information, that in fact it was represented to him at that September 17, 2010 meeting that Jomaps was defunct and that D-Mand had taken over the business. Id. Further, D-Mand has introduced evidence that in 2011, Jomaps did

not file an annual registration with the Georgia Secretary of State, which confirms the fact that Jomaps was inactive after the transfer of its assets and payables to D-Mand. Ex. 4 to DM Decl.

As for advertising, D-Mand provided a purchase order submitted on September 27, 2010 showing that it had ordered 55,000 product labels for M-1 Advanced Mildewcide, and an invoice was submitted for this labeling on September 30, 2010. Ex. 3 to Supp. DM Decl. D-Mand also submitted for the record several other examples of advertising for M-1 branded products over time from March, 2011 until this lawsuit began on April 20, 2012. Ex. 5 to Supp. DM Decl. In one of the advertisements in Paint Dealer magazine, the advertisement contains a photograph of the line of M-1 products bearing the D-Mand labels, and states "introducing D-Mand Better Products." Ex. 4 to Supp. DM Decl. It also states on the full page ad "From the Makers of M-1" and has a banner reading "The Same Great Products Have a New Family Name.…" Id. Another advertisement for a trade show refers to D-Mand Better Products (formerly Jomaps). Ex. 9 to DM Decl. Notably, in his own declaration Orr contends that he himself was "involved" in the marketing of M-1 under the D-Mand name. Supp. Orr Aff., ¶11. The advertisements make it clear that D-Mand has been marketing

M-1 for nearly two years, in an open and obvious manner. Id.; Exs. 4-5 to Supp. DM Decl.

Moreover, D-Mand pointed out that included in the transfer of assets was the formula for M-1 mildewcide and that D-Mand has that formula within its possession and control. DM Decl., ¶44. D-Mand claims that it is the only source for the consuming public of the real M-1 product, and that Jomaps has no operations, sells nothing, and could not make M-1 today if it wanted to because it transferred the formula to D-Mand, and D-Mand contends that this is a trade secret that was part of the agreement to shut down Jomaps entirely and move all of the assets to D-Mand in exchange for consideration including the payables of Jomaps. DM Decl., ¶¶19, 35, 44.

On June 16, 2011, Makowski through counsel submitted paperwork to the USPTO to register the transfer of the M-1 Mark to D-Mand. DM Decl., ¶47. Jomaps contends that Makowski was unauthorized to execute this documentation and D-Mand disagrees, referring back to the agreement it contends took place in July 2010 and was represented to third parties in the September 17, 2010 meeting, and to the records of the transfer of assets that took place in the fall of 2010. DM Decl., ¶¶18-23; Supp. DM Decl., ¶18; Ex. 2 to Supp DM Decl.

Jomaps has produced some evidence that it claims indicates that Makowski did not have a clear understanding that D-Mand had full ownership of the M-1 Mark, and they claim it supports their argument that the M-1 trademark was "carved out" of the asset transfer agreement. Supp. Orr Aff., ¶¶9-10. For example, they have submitted undated notes from Makowski to Orr in which he states that he and Orr should resolve their "disagreements" and indicating that Makowski would be willing to discuss the nature of the transfer as a long term license. Ex. A to Supp. Orr Aff. The parties dispute the date that the notes were submitted and the reasons for them. Supp. Orr Aff., ¶10; Supp. DM Decl., ¶¶3, 22-23. Orr contends the notes show that Makowski did not think he had secured ownership of the trademark, while D-Mand contends that these notes were in one case submitted before the plan to transfer altogether, and in the other case responses to an effort on the part of Orr to renegotiate the terms of the transfer, which Makowski indulged briefly, but never came to anything. Supp. DM Decl., ¶¶3, 23. D-Mand states that Makowski was never willing to discuss or agree to a temporary license revocable at will. DM Decl., ¶22. It is undisputed that Orr did not respond to the note and that D-Mand moved forward with the M-1 brand. Supp. DM Decl., ¶25.

## CONCLUSIONS OF LAW

A preliminary injunction is an extreme and drastic remedy at the outset of a case and as such it is "'not to be granted until the movant clearly carries the burden of persuasion.'" *First FashionUSA, Inc. v. Best Hair Replacement Manufacturers, Inc.*, 645 F.Supp.2d 1158, 1164 (S.D. Fla. 2009) (internal citations omitted). In order to succeed in a motion for a preliminary injunction the plaintiff must establish four elements: (1) likelihood of success on the merits; (2) irreparable harm; (3) that the harm to the plaintiff outweighs the harm to the defendant and (4) that the public interest favors the injunction. *Davidoff & CIE, S.A. v. PLD Intern. Corp,* 263 F.3d 1297, 1300 (11th Cir. 2001).

### THE PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS

The Court finds that Jomaps has failed to show a likelihood of success on the merits based on the record before the Court at this time. Jomaps admits that in 2010 it agreed to transfer to D-Mand certain receivables and payables to D-Mand, and that it gave "permission" for D-Mand to use the M-1 Mark in question for some time. Other than the M-1 Mark, Jomaps has produced no evidence to show that all of the other assets of Jomaps did not transfer to D-Mand. Essentially,

Jomaps is contending that it gave D-Mand a license to use the M-1 Mark that was revocable at will. The record indicates that the essential piece of the business is the M-1 family of branded products. Therefore, Jomaps case depends on the notion that it transferred some of the assets of Jomaps to D-Mand but "carved out" the trademark from the agreement to transfer assets.

D-Mand has produced copious records to show the transfer of all of the assets from Jomaps to it. It contends without dispute that it possesses the trade secret formula for the M-1 mildewcide at issue, and no trade secret claim is in the case. It has shown that Jomaps was left as a shell with nothing and no operations, manufacturing nothing, selling nothing, and doing nothing. Moreover, the record indicates that Orr and his counsel were representing to third parties that Jomaps was defunct.

It makes little sense to have transferred everything in the Jomaps company to D-Mand, including the goodwill, payables and other obligations, without having conveyed the trademark. The evidence shows that Jomaps went out of business for some time and other than filing a 2012 registration, is not operating now.

Jomaps contends that the transfer of the trademark from Jomaps to D-Mand is invalid because there is no writing executed by Orr consenting to the assignment

11

of the M-1 Mark. Jomaps contends that 15 U.S.C. § 1060 requires a writing signed by the transferor to make the transfer legitimate. However, the "writing" requirement of the Trademark Act has been on the books since at least 1905. Trade-Mark Act of 1905, § 10 (formerly15 U.S.C.A. § 90). Since then, many cases, including a case decided by the old Fifth Circuit which is very similar to the instant case, have held that even without a formal writing, the transfer of all of the assets of a company to another, including the goodwill, means that the trademark in question has been transferred as well. *Holly Hill Citrus Growers Ass'n v. Holly Hill Fruit Products, Inc.* 75 F.2d 13, 14-15 (5th Cir. 1935)[1]*; First FashionUSA, Inc.*, 645 F.Supp.2d at 1164 ("The law presumes that when a business is conveyed, its trade name and good will are also conveyed," granting injunction sought by the transferee (here, D-Mand) against infringement by the transferor); *Replogle v. Air-Way Co.*, 287 F. 765, 766-7 (8th Cir 1923) ("We have said that, where the owner of a trademark grants the right to another, either by sale or license, to use the mark on the goods with which its use is connected, and abandons its use himself, he cannot afterwards either deprive his assignee of the right to its use or set up an adverse

---

[1] In *Bonner v. Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent the cases of the old Fifth Circuit decided prior to October 1, 1981.

use"); *Plitt Theatres, Inc. v. American Nat'l Bank & Trust Co.,* 697 F.Supp. 1031, 1034-35 (N.D.Ill.1988) ("Ownership of trademarks and service marks passes impliedly with ownership of the pertinent building or business which the mark is associated, absent express provision to the contrary"). This Court understands the wisdom in these cases because sometimes a transfer of assets is simply not neatly bundled up with copious documentation prepared by lawyers and scriveners. But if the transfer really took place, there is no sense in invalidating the transfer of the trademark and shutting down the business of an obvious transferor.

Moreover, Orr stated in his supplemental affidavit that he was involved in the marketing for M-1 under D-Mand since 2010. Obviously he would have known D-Mand was holding itself out as the successor to Jomaps and the actual, exclusive source of the M-1 mildewcide. This lends credence to the argument that the goodwill of Jomaps in relation to the M-1 Mark was transferred with everything else. And the case law indicates that a trademark transfers with the goodwill of a company to a new operation. *Holly Hill Citrus Growers Ass'n.,* 75 F.2d at 14-15; *First FashionUSA, Inc.*, 645 F.Supp.2d at 1164.

Other than undated notes and the declarations of Orr, which are completely denied by Makowski, the record shows that Jomaps transferred all of its operations

to D-Mand and had no further activity. This includes most importantly the payables of Jomaps and contractual liabilities, the trade secrets, and the goodwill, which brought along the M-1 trademark.

## JOMAPS HAS NOT SHOWN IRREPERABLE HARM

The record is undisputed that the only company selling the real M-1 product is D-Mand. Jomaps is selling nothing and has no active operations. Therefore, this is not like a typical trademark infringement case where the defendant is selling a knock-off of the real product and may be fooling customers and harming a brand in a manner that might justify an injunction in order to prevent irreparable harm. The plaintiff has to "demonstrate the absence of a legal remedy" and that money damages would not be adequate to compensate it should it prevail in the lawsuit. *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1375 (N.D. Ga. 2001). D-Mand has shown that it is the exclusive provider of M-1 mildewcide to the market. Shutting down the sale of M-1 would essentially put D-Mand out of business. However, if D-Mand is allowed to continue the use that was admittedly permitted by Jomaps, and acquiesced to by Orr for almost 2 years, nothing in the record indicates that Jomaps would not be adequately compensated by money damages. In such a situation, a preliminary injunction is inappropriate. *Id.*, 163 F.

Supp. 2d at 1376 (mere loss of income, no matter how great, does not constitute irreparable harm and therefore does not justify a preliminary injunction). The Court holds that Jomaps has failed to meet the requirement of irreparable harm necessary to issue a temporary restraining order. Given that the Court has found that Jomaps has not met its burden of persuasion on two of the four elements necessary for the issuance of a preliminary injunction, the Court will not address the remaining two elements.

**FOR THE REASONS SET FORTH IT IS HEREBY ORDERED AND ADJUDGED THAT THE MOTION FOR PRELIMINARY INJUNCTION IS DENIED.**

**SO ORDERED this 23rd day of July, 2012.**


/s/Thomas W. Thrash
The Honorable Thomas W. Thrash, Jr.
Judge, United States District Court for the
Northern District of Georgia, Atlanta Division

Prepared and presented by:

s/ David L. Pardue
David L. Pardue
Georgia Bar No. 567217
Kaufman, Miller & Forman, P.C.

8215 Roswell Road
Building 800
Atlanta Georgia 30350-6445

*Attorneys for Defendants and*
*Third-Party Plaintiffs*

I:\WP\CW\8520-001\Motions\Preliminary Injunction\Proposed Order Denying Prelim Injunction.Final (incl Rec Cites).docx